DON WALKENHORST, APPELLEE, v. THEODORE A. (JIM) APOLIUS ET AL., APPELLEES, IMPLEADED WITH A. H. ADAMS, FIRST AND REAL NAME UNKNOWN, APPELLANT.
122 N. W. 2d 875

Filed July 12, 1963. No. 35423.

Hastings & Wanek, for appellant.

Frank B. Svoboda and W. C. Conover, for appellee Theodore A. (Jim) Apolius.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is the second appearance of this case in this court. Walkenhorst v. Apolius, 172 Neb. 830, 112 N. W. 2d 31. The case was instituted as an action in equity by Don Walkenhorst to foreclose a thresherman's lien on wheat grown by Theodore A. (Jim) Apolius, hereinafter referred to as Jim Apolius or Jim, a tenant on land described as the east half of Section 6, Township 12 North, Range 37 West of the 6th P. M., in Keith County, owned by John C. Riedel. Named as parties defendant were Jim Apolius; his father, Theodore E. Apolius, hereinafter called Ted Apolius or Ted; Security State Bank of Madrid, Nebraska; A. H. Adams; William Merrell; Farmers Cooperative Association; Cliff Hull, doing business as the Hull Grain Company; John C. Riedel; and 5,482.20 bushels of 1960 wheat in storage at the Farmers Cooperative Association and with Hull.

The defendants Jim Apolius, Security State Bank of Madrid, Nebraska, and the two elevators heretofore mentioned did not appear, and their defaults were entered.

The plaintiff Walkenhorst was paid by Jim Apolius; the landlord, John C. Riedel, has been paid; and the claims of each have been satisfied.

By order of the trial court, the wheat was sold and the proceeds of the sale deposited with the clerk of the district court for Keith County.

Any cause of action insofar as the present case is concerned has been dismissed by Ted Apolius as to William and Doris Merrell.

The trial court, in the first case, found that the chattel mortgage of the defendant A. H. Adams should be reformed and decreed to be a lien on the wheat grown on the east half of Section 6, Township 12 North, Range 37 West of the 6th P. M., in Keith County, the same

being the wheat sold and the proceeds thereof deposited in the registry of the district court, and as reformed the defendant and cross-petitioner, A. H. Adams, was entitled to a foreclosure of the chattel mortgage referred to in the petition and a sale of the mortgaged property; that there was due upon the notes and chattel mortgage as reformed the sum of $3,120, with interest from the date of the decree at the rate of 6 percent; and that said amount was a second lien on the wheat described in the reformed mortgage and subject only to the first lien in favor of the defendants Merrell. The court adjudged and decreed that A. H. Adams have and recover on his note and mortgage $3,120, with interest at the rate of 6 percent; that the mortgage be reformed and decreed to be a second lien on the wheat subject to the first mortgage in favor of the defendants Merrell; and that the clerk of the district court for Keith County pay from the funds in his possession, the same being the proceeds of the sale of the wheat, to the landlord his share, to William and Doris Merrell the amount due on their mortgage, and to A. H. Adams $3,120, the balance of the funds to be held by the clerk of the court until further order of the court. This court, in Walkenhorst v. Apolius, *supra*, reversed the judgment of the trial court and remanded the cause for trial. Ted Apolius perfected appeal to this court.

The trial court in the instant case rendered judgment in favor of the defendant Ted Apolius, decreeing that this defendant have a first lien in the amount of $6,180 on the proceeds of the sale of the wheat; that the clerk of the district court for Keith County pay the balance on hand in the amount of $59.73 to Ted Apolius; that Ted Apolius have judgment against the defendant and cross-petitioner A. H. Adams in the amount of $3,120, plus interest from February 1, 1961; and that the cross-petition of A. H. Adams be dismissed. The trial court found that the evidence relating to the alleged mistake in A. H. Adams' cross-petition was not sufficiently

clear, convincing, and satisfactory to allow a reformation of his mortgage; that Ted Apolius, by virtue of his bill of sale, had a first lien on the proceeds of the sale of the wheat to secure indebtedness of $6,180; and that A. H. Adams had recovered the sum of $3,120 from the proceeds of the sale of the wheat. The defendant A. H. Adams filed a motion for new trial. From the order overruling the motion for new trial the defendant A. H. Adams perfected appeal to this court.

The pleadings of Ted Apolius and A. H. Adams, the only parties to this litigation, are with reference to their respective claims of priority, that is Ted Apolius' bill of sale, or the chattel mortgage given by Jim Apolius to A. H. Adams, as to the wheat grown on the east half of Section 6, Township 12 North, Range 37 West of the 6th P. M., in Keith County.

Ted testified that he lived at Roscoe, Nebraska; that his wife's name was Anna Lane Apolius; and that he had a son Jim Apolius. He gave his occupation as farming, selling irrigation equipment, and dealing in real estate. He testified that he loaned Jim $2,200, evidenced by a note dated March 22, 1954, due March 22, 1955, which Ted paid to the Haggard Drilling Company for a pump that was installed on Jim's place; that Jim made payment on this note on July 8, 1958, in the amount of $500, by check; that Jim was in a position where he had to have $2,000 to pay the installment on a pump that he had purchased; and that Jim owed the Haggard Drilling Company $2,000 and Ted helped Jim out. Ted further testified that Jim owed him $4,214 for the balance due on the purchase of a farm which Jim bought from him. This is evidenced by a note dated July 17, 1953, in the amount of $4,214, due July 17, 1954. This was a continuation of the payment on the farm that Ted sold to Jim in 1952, and Jim still owed this amount when the deed to the farm was delivered to him. The deed was delivered to enable Jim to get a larger loan on the farm. Jim made a payment of $600

on July 24, 1953, and $1,182.75 on November 14, 1957. Ted further testified that he received a bill of sale from Jim for 160 acres of wheat in Keith County on April 6, 1960; and that in the spring of 1960 Jim decided to sell the farm, and at that time Ted wanted Jim to settle with him for the amounts that Jim owed him. Ted had a conversation with Jim about the obligations owing to him in March and about the time Jim was to convey the farm to the Most brothers. Ted had a half interest in the oil and mineral rights on the farm, and he asked Jim to give him a bill of sale on the wheat crop that he had left on the east half of Section 6 heretofore described. Ted gave a quitclaim deed to Jim on March 9, 1960, which was recorded March 18, 1960. This quit-claim deed conveyed to Jim one-half of all the oil, gas, and mineral rights in the northeast quarter and south-west quarter of Section 8, Township 12 North, Range 37 West of the 6th P. M., in Keith County, Nebraska. When Ted received a bill of sale from Jim on April 6, 1960, he took it to the Security State Bank of Madrid, Nebraska, and succeeded in obtaining a loan. He gave the bank a note for $3,000 on May 16, 1960. This note was due August 16, 1960. Ted also gave the bank a chattel mortgage on the 160 acres of wheat of the 1960 harvest, on the east half of Section 6 before described. This mortgage was filed of record on July 11, 1960. The bill of sale discloses a consideration of one dollar, and that Jim sold, transferred, and delivered to Ted all grow-ing wheat located on the east half of Section 6 before described, consisting of approximately 160 acres, to be harvested in 1960. The bill of sale was recorded in the office of the county clerk of Keith County on July 15, 1960.

Ted further testified that he talked to Don Walken-horst about cutting the wheat. Walkenhorst asked Ted if he knew that two other persons had mortgages on this wheat. Ted told Walkenhorst that he was un-aware of such fact. During the time Ted had the bill

of sale, he checked to see how the wheat was progressing. He testified that he could observe this from the road, and he did not drive into the field.

On cross-examination Ted testified that he gave a $2,000 check to Jim which was made out to the Haggard Drilling Company; that he believed he gave the warranty deed to the home place to Jim in 1953; that the consideration of the deed was $16,000; that he did not take a mortgage back on the farm for the reason that Jim was getting a larger loan; that he took Jim's note for the balance, and this note was for $4,214; that this did not represent all of the indebtedness that Jim owed him, only the balance due on the farm; that Jim owed him indebtedness other than that shown by two notes, in the amount of about $6,500 for money that Jim took out of the irrigation business when Jim worked for Ted as a salesman; that in his capacity as a salesman Jim collected money for Ted and worked as a salesman from 1953 until 1958; and that in 1954, Haggard contacted him about Jim's bill, and Ted undertook to lend Jim the money to pay the bill; and that in 1960, Jim decided to sell the home place to the Most brothers, and at that time Ted delivered to Jim the quitclaim deed on the oil and gas rights. He then decided to square accounts with Jim as near as he could, and he was going to realize this from the proceeds from the sale of the wheat. He had a conversation with Jim about the bill of sale when he gave Jim the quitclaim deed for the oil and mineral rights. He asked Jim what he could do about paying him what he owed him. Jim told him all he had was the wheat, and that he would give Ted a bill of sale for this wheat. Ted testified that after he got the bill of sale, he would have sold his two-thirds interest in the wheat, deposited the money, and given Jim credit for whatever it brought on Jim's note; that he knew nothing about Jim's indebtedness, except what Jim owed him; that Jim did have a bill with Thompson Pipe and Steel Company at one time in the amount of $9,000,

and it could have been $3,000 on April 6, 1960; that he also recalled an obligation to Alf Elander of North Platte in the amount of $8,000, and Jim's obligation to Bill Merrell; that he did not know of Jim's obligation to A. H. Adams or to George Hastings; and that he did remember a suit pending in the district court brought by one Hull against Jim for a fertilizer bill of over $1,000. April 6, 1960, was just prior to the time Jim was holding his machinery sale. Ted had no information that Jim's machinery was encumbered. He knew that A. H. Adams was living on the east half of Section 6 heretofore described and that Jim was farming it. Ted further testified that he had to raise some money because of his account with the Thompson Pipe and Steel Company in the amount of $4,500; and that Jim gave him a check for $1,900 in payment for the pipe that Ted had sold to Jim. At the time Jim made the $1,900 payment to the Thompson Pipe and Steel Company, he needed the pipe to complete his deal with the Most brothers.

Wendell Haggard testified that he was engaged in the business of well drilling and that in either 1953 or 1954, he installed a deep-well irrigation pump for Jim for which Jim had owed him for quite a while. The complete balance owing was paid by check after Jim had sold his farm in 1960. This check was made out by Ted, Jim's father, and $2,000 was paid by Jim's father. In this connection he was referring to the payment made in 1954 or 1955. On redirect examination he testified that the balance paid in 1960 was between $500 and $600.

The cashier of the Security State Bank of Madrid testified that Ted applied for a loan. Ted said he had a bill of sale on some wheat on the east half of Section 6 heretofore described. Ted gave this witness the bill of sale, and a loan was made to Ted in the amount of $3,000. A policy of hail insurance was written to cover the wheat shown in the bill of sale. Ted also gave the bank a note

and a chattel mortgage as security for the loan. The chattel mortgage was filed July 11, 1960.

A. H. Adams testified that he lived on the east half of Section 6, heretofore described, in 1960, and lived there from November 1958 to January 1961; that Jim came to his place to induce him to work for Jim which he did on occasions; that Jim had a farm sale in the spring of 1960; that in April 1960, Jim owned only the wheat on the east half of Section 6 heretofore described; and that on April 16, 1960, he had a conversation with Jim in Hastings' office at Grant, Nebraska. Jim gave a note to G. B. Hastings in the amount of $500, dated April 16, 1960, due July 1, 1960, and a note to this witness in the amount of $2,500 dated April 16, 1960, due July 1, 1960. At the same time he gave this witness a chattel mortgage on 150 acres of growing wheat located on the west half of Section 6 heretofore described, subject to a first mortgage in favor of William Merrell in the amount of $3,000. This mortgage was filed of record at 8 a. m. on April 21, 1960. He further testified that Jim did not have any wheat on the west half of Section 6, Township 12 North, Range 37 West of the 6th P. M., in Keith County; and that Don Most farmed that land and was doing so on April 16, 1960. This witness further testified that he had two notes on the 1959 crop of wheat raised by Jim, and that the chattel mortgage given by Jim on April 16, 1960, was security for those two notes. A. H. Adams further testified that he intended to take a mortgage on the wheat on the east half of Section 6 heretofore described; and that he placed the letter "E" on the chattel mortgage after he found out the description on the mortgage was wrong. He corrected the chattel mortgage before the harvest. The chattel mortgage should read "east" half of Section 6 heretofore described. This witness further testified that he did not have any conversation with Jim on April 6, 1960, the date the bill of sale was given by Jim to Ted, and never discussed the bill of sale with either Jim or Ted; that the

first he heard of the bill of sale was when he hauled part of the wheat to Roscoe; and that Don Walkenhorst was cutting the wheat and asked this witness to haul it.

Don Walkenhorst testified that he knew Ted and Jim; that in 1960, he cut the wheat for Jim; that he had had a conversation with reference to harvesting the wheat when Jim moved to Colorado in the spring of 1960; that Jim told him to wait until the wheat was ripe and then cut it, which he did; and that he called Ted on the telephone a week or 10 days before he cut the wheat and Ted said that he owned the wheat. This witness further testified that he had a conversation with A. H. Adams the day before he cut the wheat and Adams told him that he, Adams, had a mortgage on the wheat and that this witness might just as well cut it; and that A. H. Adams drove a truck and hauled the wheat.

A. H. Adams was recalled and testified that from April 1, 1960, until the wheat was harvested he did not have any conversation with Ted about the ownership of the wheat; that he did not remember seeing Ted during the period of time from April to July 1960; that he learned about the bill of sale after he hauled wheat to Roscoe; that he saw Ted one time after he commenced harvesting the wheat when Ted came out to the field and said to him: "Well, I see they got you a working"; and that nothing was said about Ted claiming ownership of the wheat. He further testified that there was an agreement between this witness and Jim which provided in substance that in consideration of the extension of Jim's indebtedness to A. H. Adams in the amount of $2,500 and to G. B. Hastings in the amount of $500, Jim executed a chattel mortgage in the name of A. H. Adams in the amount of $3,000, and executed a note to A. H. Adams in the amount of $2,500 and a note to G. B. Hastings in the amount of $500, to be paid July 1, 1960. To secure the notes Jim gave a chattel mortgage in the amount of $3,000 payable to A. H. Adams for the indebtedness that Jim owed A. H. Adams. This agree-

ment provided further that if Jim failed to harvest the wheat described in the chattel mortgage on the west half of Section 6, Township 12 North, Range 37 West of the 6th P. M., in Keith County, at the time the same was ready for harvest, Jim would authorize and empower A. H. Adams to enter upon the land and have the wheat harvested at the time of its maturity; and that the proceeds of the sale of the wheat should be used first to pay for the cutting and harvesting of the wheat, second to pay the amount of $3,000 with accrued interest to William Merrell who held a first mortgage on the wheat, then to pay A. H. Adams and G. B. Hastings in the aggregate amount of $3,000 and accrued interest, and the balance to be paid to Jim. A. H. Adams further testified that he did not know exactly when he did alter the description in the chattel mortgage; and that he changed it after Jim had signed it. On redirect examination A. H. Adams testified that Hastings assigned his note to this witness.

The defendant Adams assigns as error that the trial court erred in decreeing that Adams had no right to reformation of the chattel mortgage executed and delivered to him by Jim Apolius; that the trial court erred in holding the bill of sale given to Ted Apolius by Jim Apolius constituted a valid lien upon the proceeds of the wheat and that the same was superior to the chattel mortgage held by A. H. Adams; that the trial court erred in failing to find that the bill of sale was fraudulent as to Adams; and that the trial court erred in rendering judgment in favor of Ted Apolius when there was not sufficient evidence to sustain the judgment and when the judgment was contrary to the law.

While the law requires this court, in determining an appeal in an equity action involving questions of fact, to reach an independent conclusion without reference to the findings of the district court, this court will, in determining the weight of the evidence, where there is an irreconcilable conflict therein on a material issue,

consider the fact that the trial court observed the witnesses and their manner of testifying. See Smith v. Hornkohl, 166 Neb. 702, 90 N. W. 2d 347.

The defendant A. H. Adams cites section 36-204, R. R. S. 1943, which provides in part: "Every sale made by a vendor of goods and chattels in his possession or under his control, * * * unless the same be accompanied by the immediate delivery, and be followed by an actual and continued change of possession of the things sold, * * * shall be presumed to be fraudulent and void as against the creditors of the vendor, * * * and shall be conclusive evidence of fraud unless it shall be made to appear on the part of the persons claiming under such sale * * * that the same was made in good faith, and without any intent to defraud such creditors or purchasers."

Section 36-301, R. R. S. 1943, provides in part: "Every mortgage or conveyance intended to operate as a mortgage of goods and chattels hereafter made, which shall not be accompanied by an immediate delivery and be followed by an actual and continued change of possession of the things mortgaged, shall be absolutely void as against a creditor or creditors of the mortgagor, * * * unless the mortgage, or a true copy thereof, shall be filed in the office of the county clerk of the county where the mortgagor resides, * * *."

Section 36-401, R. R. S. 1943, is cited. It provides in part: "Every conveyance or assignment, in writing or otherwise, of any estate or interest in * * * goods * * * made with the intent to hinder, delay or defraud creditors or persons, of their lawful rights, damages, forfeitures, debts or demands, * * * shall be void."

The defendant A. H. Adams asserts that Ted and Jim conspired and set up a scheme and a device to defraud him.

As we view the record it shows that Jim was indebted to his father, Ted, for a considerable amount of money, as well as to other creditors. The only creditor making

a claim in this case was the defendant A. H. Adams. Ted wanted to perfect a settlement with his son. This resulted in the son giving the father a bill of sale to the wheat crop heretofore mentioned. From all of the evidence, the trial court could conclude that Jim did owe his father a considerable amount of money, and thereafter Jim executed a chattel mortgage to William Merrell and defendant A. H. Adams covering the same property that was shown in the bill of sale.

In Carlson v. Kirchman, 131 Neb. 229, 267 N. W. 452, it was held that the question of fraudulent intent in all cases pertaining to fraudulent conveyances under the laws of Nebraska shall be deemed a question of fact, and not of law.

In Sweley v. Fox, 135 Neb. 780, 284 N. W. 318, this court held: "To warrant reformation of a mortgage for mutual mistake, the proof must be clear, convincing, and satisfactory." See, also, Wheeler v. Brady, 126 Neb. 297, 253 N. W. 338, to the same effect. The same applies to a chattel mortgage.

To warrant reformation of a chattel mortgage where there is a misdescription of land upon which a crop of wheat is growing, the proof must be clear, convincing, and satisfactory.

In 76 C. J. S., Reformation of Instruments, § 84, p. 454, the general rule is stated as follows: "It is generally held that in order to establish a cause of action for reformation of an instrument a mere preponderance of the evidence is insufficient, and the evidence must be clear and convincing and satisfactory."

The evidence in the instant case fails to show that Ted Apolius entered into a conspiracy with his son Jim to defraud the defendant A. H. Adams. The evidence shows that Ted took the bill of sale from Jim Apolius in good faith to apply on the indebtedness that Jim owed him. There is no competent evidence that Ted Apolius knew anything about the transactions between Jim Apolius and A. H. Adams.

Applying the rules heretofore set out, we conclude that the trial court did not err in finding that the evidence was insufficient to warrant A. H. Adams to reform the chattel mortgage. Ted Apolius was a third party, and without notice of the existence of the chattel mortgage cannot be held responsible for the mistakes made by Jim Apolius or A. H. Adams with reference thereto.

As to whether or not A. H. Adams took possession of the wheat, the evidence is in conflict. The record shows that Don Walkenhorst was hired by both Ted and Jim to cut and harvest the wheat and was paid by Jim. Adams did testify that he hauled the wheat to town under the direction of Don Walkenhorst who harvested it. He picked up the tickets at the elevator, which is a common practice and insufficient to disclose possession or control of the wheat. A. H. Adams also testified that he took possession of the wheat under an agreement with Jim authorizing him to do so. The trial court resolved this conflicting testimony to the effect that A. H. Adams did not take possession of the wheat at any time.

We conclude that for the reasons given the judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.