JOE D. PIERCE ET AL., APPELLEES, v. HERMAN RABE ET AL., APPELLANTS.

131 N. W. 2d 183

Filed November 6, 1964. No. 35711.

Robert V. Hoagland, for appellants.

W. L. Brennan, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

Plaintiffs Joe D. Pierce and H. R. Pierce, brothers as coowners of certain land mentioned herein, brought this action in the district court for Boyd County, Nebraska, against the defendants Herman Rabe and Emelia Rabe, husband and wife, to procure an injunction enjoining defendants from erecting and padlocking gates or interfering with the plaintiffs' right to use a road extending east and west over and entirely through the defendants' land which connects the plaintiffs' premises with a road running north and south on the section line three-fourths of a mile east of plaintiffs' land.

The parties will be designated as they were in district court except where one is referred to when their first and last names or initials will be used.

The county judge had issued a temporary order restraining the defendants from padlocking the gates. In district court a similar temporary injunction was entered based on the stipulation of the parties. At the conclusion of a trial to the court the temporary order was made permanent, and the defendants' motion for a new trial having been overruled, they have appealed to this court.

The defendants assign as errors to the trial court that its decision is contrary to the law and the evidence; that the court erred in finding from the evidence that a public road had been established for the requisite period of time by prescription; and that the court erred in failing to quiet title to the real estate as prayed for by defendants as against a purported clause in the deed from the defendants to Boyd County which referred to

an accommodation road and will be hereafter set out.

The defendants own a tract of 160 acres of land in the center of Section 33, Township 35 North, Range 14 West of the 6th P.M., in Boyd County, consisting of the four contiguous regular governmental 40-acre divisions of said section which have a common point at the center thereof.

The plaintiffs own approximately 320 acres to the west thereof in Sections 33, 32, and 29 of the same township and range.

The premises of both parties have a common boundary 80 rods long. This boundary consists of the west line of the southeast quarter of the northwest quarter of said Section 33, owned by the defendants, which is also the east line of the southwest quarter of the northwest quarter of said section belonging to the plaintiffs who own the entire 80 acres contained in the west half of the northwest quarter of said section as a part of their 320 acres.

Ponca Creek traverses the area involved entering the eastern boundary of the defendants' land from whence its course proceeding upstream bends southward and thereafter turns northerly and winds through the defendants' land and crosses the boundary common to both parties about 30 rods south of its northernmost extent.

On the east line of Section 33 is a county road running north and south along the section's entire length. The road in controversy starts just to the north of the half-section line joining the said county road from the west, and proceeds west 80 rods to the east line of the 160-acre farm of the defendants. This portion of the road was deeded to the county by the conveyances hereinafter discussed. It is 40 feet wide. Thereafter the remaining portion of this alleged roadway, which is the real subject of the controversy, proceeds north on the east side of the defendants' premises for about 40 rods where it turns west and extends in a westerly direction, but not

on a completely straight line, near or through but in any event past defendants' homestead and buildings to a point near the north bank of Ponca Creek. There it angles more to the northwest crossing the common boundary line into the plaintiffs' premises about 20 rods south of the northwest corner of the defendants' farm. After that it proceeds in a northwesterly direction to the plaintiffs' home and buildings, and then turning first northerly and then northwesterly, crosses the southwest corner of Section 28 and enters Section 29 to the west. There is a public township road between those sections which apparently the road in question eventually joins. The evidence as to this latter road is somewhat conflicting. Joe Pierce and the plaintiffs' witnesses testify that it is almost impossible to traverse except on horseback or foot on most all occasions and the defendants refute this at least to some extent. The evidence seems to establish that the terrain it traverses after leaving the plaintiffs' building area is quite rough and the road has not been kept in repair. Because of this at least, the road is practically impassable for trucks, implements, or loads of hay. The neighboring towns to the south in which many farmers traded could not be reached over this road going north without a long circuitous journey.

The testimony concerning the use of the road by the public is in great conflict. That favoring the plaintiffs will be first summarized. The plaintiff Joe Pierce is a single man 60 years of age. His brother, H. R. Pierce, lives at Lincoln. Joe Pierce lived with his brother, Albert, now deceased, on the land the plaintiffs now own from 1932 to 1936. His mother formerly owned it. Later he moved away but came back and now occupies it. Prior to 1933 the buildings on plaintiffs' land were on the south side of Ponca Creek but about that year they were moved to their present location on the north side. In addition to the plaintiff Joe Pierce, nine other witnesses testified as to the use of this road by others. They included those whose ages were 66, 67, 59, and

71, respectively. Several of them had lived in the vicinity all their lives and purported to know of the use made of this road over a great many years. Most of them had lived on farms on and near it; others had relatives or friends residing thereon whom they visited. In some instances they relate driving to town on it or taking their children to school. There was testimony as to this road and the travel on it in 1910, and up to the padlocking of the gates by the defendants in 1963. The testimony of several related only to particular periods and a great amount of the evidence concerned the years 1910, 1911, 1923, and other years in the 1920's or 1930's. However, by dovetailing the several periods concerning which there is testimony and relating that to what was said by witnesses whose accounts cover many years, there is substantial evidence that throughout the period it was traveled by the public although recently to a lesser extent. In the earlier years the area had been much more thickly settled and there were homes on every quarter section. Because of recent agricultural developments farms were consolidated, the number of homes reduced, and travel from the west on this road has markedly diminished. In the earlier periods those traveling by horse and buggy cut across the unfenced pastures involved and drove on different trails running across them. However, there is evidence that for more than 10 years at a time the defendants' premises were fenced and two to four gates were maintained on this road as it crossed the defendants' premises.

In the latter years the plaintiffs' land was apparently the only one having a residence on this road to the west of the defendants' premises. Joe Pierce testified he, his friends, and others continued to use it. After the giving of the deeds to the county, the road through Rabes' 160-acre farm had been graded although by whom he does not say, and on several occasions the snow had been removed therefrom by the county. All witnesses agree they had never asked nor were given permission

to travel on it although no one had ever objected to its use. Some said the course of the road had changed over the years to an extent which varied considerably in the testimony. Most of them, however, agreed its course throughout the period was substantially the same. It appears at one time it ran south of the defendants' building spot and now runs through them, a difference of a few rods. The bridge the county later built was in a slightly different position from the original ford or a previous bridge built by the cooperation of the neighborhood.

The résumé of the testimony of the two defendants and their witnesses with respect to the use by the public of the road in question is now set forth. Herman Rabe is 60 years of age. He has lived in Boyd County all his life but became acquainted with the vicinity for the first time in 1932. He leased the land now owned by them either in that year or 1933 from Herb Audiss, one of his predecessors in title, and has lived on the premises ever since. He rented the land but not the buildings now owned by the plaintiffs from March 1, 1952, to March 1, 1958. Defendants bought the 160 acres they had first leased from the Audiss family by deed dated February 26, 1947. When they went into possession of the 160 acres under the lease, Herman Rabe testified there were two different trails across the defendants' land, one to the north from the defendants' buildings and another running east and west, but in 1947 he says the trail to the west was changed by 20 rods. In 1933 the trails through the land were not used by many people. There were then too many gates, at least four, upon it. The defendants and others with whom he traded work, and Emma Zimmerley, a neighbor, traveled on it. While renting the Pierce place, Joe Pierce came out about once a month to look things over. Art Audiss, who had farmed the Pierce place, took his children to school on these trails. According to him most of them did not, however, use this entire road in question but took the

other trail from the north down the hill to the buildings on the defendants' farm and then on west to the land which is now the plaintiffs. He said the road over the hill has not been used for from 12 to 14 years. He further testified to many changes in the road across his place from east to west. These changes he says were made about 1947, about the time the grade was built. What grading was done through his farm was done by him. Snow removal was not mentioned by him. From 1953 to 1960 no one traveled the east-west road entirely through the 160 acres except Joe Pierce and his friends. In 1947 William Gently had used it.

Emelia Rabe gave testimony quite similar to her husband although she gave the names of more people who had used the trail, most but not all of whom she said came down the hill from the north. Some of the witnesses that testified for the plaintiffs might have used the trails whom she had not noticed.

Only two other witnesses testified for the defendants with regard to the use of the roads or trails which went through the defendants' land. They were husband and wife. They lived at Bonesteel, South Dakota. The husband had rented the defendants' 160 acres from their predecessor in title for the 3 years prior to 1933. They had not lived in the locality nor been on the premises before or since. During their occupancy of the land, the husband testified that not many drove across the land at that time. He could not recall many except the tenants who then occupied the plaintiffs' property and two other families whom he named. Some of them went north up the hill from the buildings and some went east across the place. The neighbors never asked permission to use such trails. A few times he used the portion of this road that went further west through the plaintiffs' land to get north to the school house. He said there was a gate on this road but he could not remember where it was and he tells of a bridge but from the record it is difficult to tell where this bridge was located.

The wife's testimony is much the same although she does definitely refer to the road going east out of the plaintiffs' place and as to its being used only by a few.

A witness for the plaintiffs testified on rebuttal that he had lived on an adjoining farm north of the defendants' farm for 13 years and had owned it for the last 10. He said there really was no road going north up the hill from defendants' land. He described it as just where "they" went up the hill to other land formerly belonging to "Audiss" which "Rabe" farmed. No machinery could be taken up the hill as it was too sandy unless the ground was frozen, or strawed in summer. One would have to travel by saddle horse or horse and buggy. He had lived in the community 64 years. He had gone into the defendants' premises with a horse and buggy both from the north and east. The road north up the hill from defendants' place had never gone out to the road as there were too many creeks to cross.

Another aspect of this case concerns the deed given by the defendants to Boyd County. When defendants bought their farm in 1947, the conveyance to them included in addition to the 160 acres what may be described as the south rod of the southeast quarter of the northeast quarter of said Section 33. By deed dated and acknowledged May 22, 1947, this was conveyed by the defendants to Boyd County. Enough additional land adjoining this on the north to make a 40-foot roadway was procured by conveyance from others to the county. The deed from defendants to the county is in evidence. It was not recorded until April 4, 1950, and it appears to have been lost for a time. The printed portion of the deed has the blanks filled in by typewriter including the description of the strip conveyed. Immediately thereafter there appears printed by hand in pen and ink, the following: "It being the intention that the present travelled road across the balance of the Herman Rabe land be considered to be an accomodation (sic)

road." Its execution by both defendants was acknowledged by C. J. Tomek, county clerk of Boyd County, and the signatures witnessed by the clerk and Bert Kenaston, at that time county supervisor. The testimony concerning the execution of the deed by the defendants to Boyd County as well as the insertion of the hand printed portion thereof is in great conflict.

The witness thereon, A. L. Kenaston, testified that the land of the plaintiffs and defendants at the time of the giving of the deed was in his supervisor district. Herman Rabe had talked to him concerning the county constructing a bridge on the strip of road leading to defendants' land. He had told Rabe the county could not place a bridge on a private road and that enough land had to be secured to make it a 40-foot road. If Rabe would give Pierce an accommodation road and the 40-foot strip was acquired, the county would build the bridge. He testified the deed was drawn up at the courthouse and the witness came in when it was being prepared. Herman Rabe sat at the end of the counter but he does not remember where Emelia Rabe sat, in fact, he does not recall whether or not she was there. Tomek, the county clerk, asked him to sign as a witness and he did so. The phrase in question was in the deed when it was signed. It would not have been accepted nor the bridge built if it had not been in it. He said the county wanted "Pierce" to be given a road out and the question was whether there was an open road down there and they called it "an accommodation road, an open road." The county board had gone down before and looked it over. He said that he had never gone to defendants' house with Tomek and the deed was not executed there but at the courthouse.

The defendants both testified that the deed was not signed at the courthouse; that Kenaston and Tomek came out to the defendants' house about this bridge and told them they would have to deed the county the strip for a road; and that they were in the kitchen there on

May 22, 1947. On direct examination Herman Rabe first said: "Q. Now, at that time, did Mr. Tomek have a deed for you to sign prepared? A. He didn't have no deed, no; he just had a piece of paper, and he says we will fix it up when we get to town. We signed it, but I never got to see it. Q. Did you sign a deed to it, at that time? A. If I signed a deed, at that time, the only thing I signed was what we signed at our house. Q. Showing you, Mr. Rabe, the plaintiffs' Exhibit number six, which purports to be a deed from you and your wife to Boyd County, dated May 22, 1947, was that the paper that was signed at your house? A. If this paper was there at the house; I can't remember. Q. You did sign some paper? A. Yes, I signed some paper there, and so did my wife, but I don't believe this here was on that paper, if it was. Q. You say 'This here,' to what are you referring? A. This part in here (pointing to exhibit). Q. When you point out to 'This here,' you are referring to that part of the instrument that is written in pen and ink; or printed in ink? A. Yes. Q. Was that on there at the time you and Mrs. Rabe signed it in your home? A. I don't think it was, because I sure would not have signed it if it was. Q. Did you have any discussion, at that time, with Mr. Tomek, as you remember now, relative to an accommodation road? A. Well, that was never mentioned to me, so if it was in there it was put in there afterwards." Thereafter he testified that nothing had ever been said to him about an accommodation road. Kenaston and Tomek assured him defendants would not be "tied down" in any manner. The subsequent testimony of both defendants is quite positive that the writing was not in the deed when signed. It was signed at their home in the kitchen, Herman Rabe read it over, and the writing was not there. It had to have been inserted later and the first time either of them knew about it was at a meeting of the county board on January 8, 1963, concerning the

road in question, at which they appeared with their attorney.

This is the substance of the evidence necessary for our decision in this case. The substantive law necessary for its determination is contained in the opinion of this court in State ex rel. Game, Forestation & Parks Commission v. Hull, 168 Neb. 805, 97 N. W. 2d 535, where the pertinent rules are set out as follows: "The use and enjoyment which will create title by prescription to an easement are substantially the same in quality and characteristics as the adverse possession which will give title to real estate. The use and enjoyment must be adverse, under claim of right, continuous, notorious, exclusive, with the knowledge and acquiescence of the owner of the servient tenement, must continue for the full prescriptive period, and must be substantially identical.

"To establish a prescriptive right to an easement, all of the elements of a prescriptive use and enjoyment must be established by clear, convincing, and satisfactory evidence. * * *

"If the owner of land encloses it with a fence and installs gates therein at the entrance and exit where the right-of-way is claimed across the tract, it is evidence that he recognizes the right of those who use the road to continue to use it.

"If a claimant has shown notorious, continuous, and unmolested use of land for a period of time sufficient to acquire an easement by adverse use, it will be presumed to have been under a claim of right. The owner of the servient estate, in order to avoid the acquisition of an easement by prescription, has the burden of rebutting the presumption by showing the use to have been permissive. * * *

"It is not indispensable to the establishment of a highway by prescription that there has been no deviation in the line of travel. If the course of travel has remained substantially unchanged for the full period, it

is sufficient even though at times, to avoid encroachments, obstructions, or the like upon the road, there have been slight changes in the line of travel.

"If the owner of land over which a road extends changes the route for his convenience or advantage, and if the public continues the use of the highway as changed and public authorities expend public funds on the improvement of the highway, the owner of the land cannot question the identity of the line of travel. The public right therein does not become extinguished but exists in the highway as changed and the owner of the land may not question the identity of the course of the highway.

"Change in the course of a road after the right of the public is established by use for the statutory period does not defeat the public right to the use of the road as previously established.

"A public highway may be established by implied dedication in this state for use as a public highway if there is present an intent to appropriate an easement for such public use. The intent may be expressed in the visible conduct and acts of the owner if they are such as would cause ordinarily prudent men to infer an intent to dedicate a right-of-way for a public highway; and if they are so received and acted upon by the public, the owner cannot after the acceptance recall his appropriation."

Applying the law in the cited case set out, it appears that the weight of evidence preponderates in favor of the plaintiffs showing an established right of user by the public to the road by prescription continued for the statutory period of 10 years. In our opinion the use for the required period antedated the time when the defendants came upon their lands as tenants and continued thereafter. That the roadway was not used to the same extent in later years would not terminate the right of user. It appears to be still traveled by some. The lesser use at present is accounted for by the change in

the number of inhabitants in the vicinity.

The clause in the deed to the county if placed therein before its execution lends support to plaintiffs' theory that the defendants knew and were conceding the plaintiffs had previously a right to travel thereon. It would appear the trial court did not base its decision on dedication and this court having agreed with its decision it is not necessary to determine whether it could be sustained on other grounds. However, evidence tending to show dedication may also bear on the question of prescription, and vice versa. Burke v. Diers, 102 Neb. 721, 169 N. W. 263. This of course depends on whose testimony is to be accepted in respect to its execution. It is to be noted that the first portion of the direct evidence of Herman Rabe quoted herein suggests he remembered little of what he signed. The latter portion thereof seems to be prompted by the question put to him. The subsequent positive testimony of both defendants stressing their theory of the deed's execution is weakened to a considerable extent by that which preceded it.

"While the law requires this court, in determining an appeal in an equity action involving questions of fact, to reach an independent conclusion without reference to the findings of the district court, this court will, in determining the weight of the evidence, where there is an irreconcilable conflict therein on a material issue, consider the fact that the trial court observed the witnesses and their manner of testifying." Walkenhorst v. Apolius, 175 Neb. 583, 122 N. W. 2d 875.

The trial court evidently gave credence to the version of the evidence given by the plaintiffs' witnesses. Our examination of the record indicates its decision on the disputed evidence was correct. We are therefore constrained to accept the evidence offered by the plaintiffs as to the execution of the deed and the presence of the clause in the deed with respect to the accommodation road. The county was willing to build the bridge

if the road in question could be used by the plaintiffs. The defendants gave the deed. The road was opened and the bridge was built, and apparently the road was cleared of snow at times. Under the circumstances the defendants are in a poor position to urge no right of the public to now use it. Further, the provisions placed in the deed to a certain extent indicates the defendants knew of the rights of the public in the road when the deed was prepared and the clause inserted or they would not have made the concession.

It follows that the judgment of the trial court should be and is affirmed.

AFFIRMED.